IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | Case No. |
| 1329 4th STREET, N.E. | ) | |
| WASHINGTON, D.C. 20002 | ) | <u>UNDER SEAL</u> |

<u>AFFIDAVIT IN SUPPORT OF SEARCH WARRANT</u>

I, Lavinia A. Quigley, being duly sworn, hereby depose and state as follows:

**A.    Introduction**

1.    I am a Police Officer with the Metropolitan Police Department (MPD), in

Washington, D.C.   I have been a sworn officer with MPD since 1989.   My current rank is a

Detective, second grade, and I have been assigned to the Major Narcotic Branch of the Criminal

Investigations Division, or its predecessors, since August 1994.   Before this assignment, I worked

with the MPD Rapid Deployment Unit for four years, specializing in vice, narcotics, and gun-

recovery investigations.   Throughout my law enforcement career, I have attended classes, seminars,

and special training sessions on the manufacture, packaging, use, and distribution of controlled

substances, as well as the detection and apprehension of narcotics traffickers.

2.    I have served as an undercover officer buying illegal narcotics for six years and have

made more than 1000 undercover purchases of illicit drugs of all kinds, including cocaine powder,

crack cocaine, marijuana, and heroin.   Because of my experience, I am frequently called upon to

assist in federal narcotics investigations by making undercover purchases of illegal drugs for such

agencies as the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA),

and the Bureau of Alcohol, Tobacco, and Firearms (ATF).   In the course of my police duties, I have

interviewed hundreds of persons arrested in Washington, D.C., Maryland, and Virginia engaged in

the illegal narcotics trade concerning their unlawful activities. Further, I have spent many hundreds of hours engaged in secret surveillance of persons involved in illegal narcotic activity. I also have participated in a number of long-term vice investigations that have resulted in prosecutions in federal and local courts in Washington, D.C. As a result, I often have testified in federal and local courts. I have also served as the affiant for more than 200 narcotics or firearm search warrants issued by judges of the Superior Court of the District of Columbia and the U.S. District Court for the District of Columbia.

3.     This proposed search is one of several being conducted simultaneously to crack down on trafficking of counterfeit merchandise and theft of intellectual property. The facts set forth in this affidavit are based upon my own personal knowledge; knowledge obtained from other individuals, including law enforcement officers and industry representatives; my review or the review by other law enforcement officers of documents and of audio and video recordings of undercover law enforcement activities related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; consultations with technical experts both in law enforcement and industry; and information gained through my training and experience. Among the industry experts consulted during this investigation is Blazer Investigations whose private investigators have received extensive training from the manufacturers of trademarked goods, including Louis Vuitton, Gucci America, Inc, Burberry of England, Kate Spade, and Coach, in the recognition of counterfeit goods and who have experience assisting the FBI, United States Customs, and State and local police agencies in the detection of counterfeit goods. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the

course of this investigation.

4.    I make this affidavit in support of an application by the United States of America for the issuance of a warrant to search the premises located at 1329 4th Street, NE., Washington, D.C., as more particularly described in Attachment A of this affidavit, hereby incorporated by reference, for the items described in Attachment B of this affidavit, hereby also incorporated by reference, which constitute evidence, contraband, fruits, or instrumentalities of violations of criminal conspiracy and counterfeit goods trafficking laws, namely, Title 18, United States Code, Sections 371 and 2320.

**B.    Background**

5.    In December 2004 the Spotsylvania County Sheriff's Office, in Spotsylvania, Virginia, executed search warrants on two locations suspected of trafficking in counterfeit products. Seized during execution of the search warrants was over $150,000 in retail value of counterfeit purses and wearing apparel. During the search of one of the locations, business and financial records were uncovered linking the illegal Virginia based activity to businesses located in the 1300 block of 4th Street, N.E., Washington, D.C.

6.    In January 2005 your affiant was contacted by Mr. Edward J. Doyle, Director of the Financial Crime Intelligence Center, Virginia Attorney General's Office, regarding the investigation of businesses trafficking in counterfeit goods in the 1300 block of 4th Street, N.E., Washington, D.C. Mr. Edward J. Doyle has been the Director of the Financial Crime Intelligence Center for the Office of the Attorney General of Virginia since June 2002. Mr. Doyle is also a sworn Auxiliary Deputy Sheriff with the rank of Detective with the Spotsylvania County Sheriff's Office. Prior to his current employment, Mr. Doyle was employed by the U.S. Department of the Treasury's Financial Crime

Enforcement Network (FinCEN), the U.S. Central Intelligence Agency, the Illinois Department of Law Enforcement's Division of Criminal Investigation, and the Illinois Legislative Investigating Commission.  He has over 35 years of experience in organized crime and drug related law enforcement and intelligence work; has participated in, conducted, and directly or indirectly supervised over 1,500 criminal investigations relating to money laundering; and has participated in over 15 counterfeit trademark cases.

7.     From January 2005 through the present, your affiant, along with Detective Doyle and other members of the Washington DC Metropolitan Police Department's Major Narcotics Unit, Major Case Squad, conducted an investigation relating to the sale of counterfeit products by WAZIR MARBLE AND GENERAL MERCHANDISE, located at 1329 4th Street, NE, Washington, D.C., in violation of Title 18, United States Code, Sections 371 and 2320.  According to Virginia State Corporation Commission Records, the Directors of this company include ISMAEL WAZIRY and Shah Waziry who both reside at 7437 Dulany Drive, McLean, Virginia.  The investigation included surveillance of the premises and undercover purchases from the business.  Based upon this investigation, it is clear that the managers and employees of WAZIR MARBLE AND GENERAL MERCHANDISE at 1329 4th Street, NE, Washington, D.C., are engaged in the commercial sale of counterfeit products to members of the public.  Your affiant also believes the listed owners of WAZIR MARBLE AND GENERAL MERCHANDISE are laundering the proceeds from the illegal sale of counterfeit products through local bank accounts.

**C.     Relevant Code Sections**

8.     Title 18, United States Code, Sections 371 and 2320 provide in pertinent part:

<u>Section 371</u>:

4

If two or more persons conspire ... to commit any offense against the United States ... and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

Section 2320:

**(a)**      Whoever intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services shall, if an individual, be fined not more than $2,000,000 or imprisoned not more than 10 years, or both, and, if a person other than an individual, be fined not more than $5,000,000.

**(b)**      Upon a determination by a preponderance of the evidence that any articles in the possession of a defendant in a prosecution under this section bear counterfeit marks, the United States may obtain an order for the destruction of such articles.

**... (e)**  For the purposes of this section –
    **(1)**      the term "counterfeit mark" means –
        **(A)**      a spurious mark
            **(i)**      that is used in connection with trafficking in goods or services;
            **(ii)**      that is identical with, or substantially indistinguishable from, a mark registered for those goods or services on the principal register in the United States Patent and Trademark Office and in use, whether or not the defendant knew such mark was so registered; and
            **(iii)**      the use of which is likely to cause confusion, to cause mistake, or to deceive. . . .
    **(2)**      the term "traffic" means transport, transfer, or otherwise dispose of, to another, as consideration for anything of value, or make or obtain control of with intent to so transport, transfer, or dispose of. . . .

**D.      The Investigation**

    **1.      January 26, 2005, Undercover Purchase**

9.      On January 26, 2005, acting on information that businesses located in the 1300 block of 4th Street, NE, Washington, D.C., were trafficking in counterfeit handbags, your affiant proceeded to Washington Perfume and Watch Center, also doing business as WAZIR MARBLE AND GENERAL MERCHANDISE, located at 1345 4th Street, NE, Washington, D.C., to purchase

counterfeit handbags. Your affiant engaged in a conversation with an unidentified man ("UM"), asking him if they had any brand name - meaning counterfeit - pocketbooks for sale. The UM told your affiant that she would have to go to "our other" store five doors down, WAZIR MARBLE AND GENERAL MERCHANDISE, located at 1329 4th Street, NE, Washington, D.C.

10.    Your affiant then proceeded to 1329 4th Street, NE, location of WAZIR MARBLE AND GENERAL MERCHANDISE. Once inside, your affiant engaged in a conversation with two males, subsequently identified as ISMAEL WAZIRY and QUDRAT WAZIRY. QUDRAT WAZIRY assisted your affiant in selecting seven counterfeit handbags, two Coach, one Gucci, one Chanel, two Prada, and one Louis Vuitton, along with two counterfeit Gucci wallets, for purchase. Your affiant paid ISMAEL WAZIRY $168 in MPD funds and was given a receipt for the items. All items purchased during this undercover visit were later inspected by private investigators from Blazer Investigations and found to bear counterfeit marks, that is, spurious marks which are identical with, or substantially indistinguishable from, marks that are registered for those goods on the principal register in the United States Patent and Trademark Office and are in use, in violation of Title 18, United States Code, Section 2320.

**2.    April 25, 2005, Undercover Purchase**

11.    On April 25, 2005, your affiant, along with a Cooperating Witness (CW), proceeded to WAZIR MARBLE AND GENERAL MERCHANDISE, 1329 4th Street, NE, Washington, D.C., for the purpose of purchasing counterfeit products again. Upon entry, your affiant and the CW were met by ISMAEL WAZIRY. The CW greeted ISMAEL WAZIRY and told him the CW and your affiant were looking for some handbags. ISMAEL WAZIRY spoke in Farsi to another man, subsequently identified as QUDRAT WAZIRY, who was conducting business behind the counter.

6

QUDRAT WAZIRY then directed the CW and your affiant to follow him into the back of the store.

12.     Your affiant and CW proceeded to a storage room in the back of the store where QUDRAT WAZIRY displayed counterfeit handbags bearing spurious, federally registered trademarks of Louis Vuitton, Coach, Gucci, Prada and Burberry.  Your affiant noted there were several hundred handbags both in boxes and stacked loosely throughout the storage room. QUDRAT WAZIRY told your affiant that the Louis Vuitton purses would cost $26 but that if they bought several pieces he would only charge $25.  QUDRAT WAZIRY said the Prada and Gucci bags were $18 apiece and that Coach bags were $22 and Coach fabric bags were $25.

13.     QUDRAT WAZIRY showed your affiant and the CW several models and styles of counterfeit purses, each bearing what appeared to be a counterfeit trademark logo or design, and he explained which brands were the best sellers.  Your affiant and the CW selected several counterfeit bags for purchase and then proceeded with QUDRAT WAZIRY up to the front of the store.  Your affiant noted that handbags bearing what appeared to be counterfeit trademark logos and designs were displayed not only along the wall of the store, but also in open boxes in the aisle.  Also displayed in the store were shoes, belts, hats and other apparel bearing what appeared to be counterfeit trademark designs and logos.

14.     Once at the front counter, QUDRAT WAZIRY displayed counterfeit wallets along with counterfeit Fendi and Christian Dior purses, stating the purses would cost $35 each.  When asked how much your affiant could charge for the purses, QUDRAT WAZIRY stated for the $18 purse your affiant could charge $65, adding that one of his customers charges several hundred dollars for a $26 counterfeit Louis Vuitton purse.  QUDRAT WAZIRY then added up the sale, computing the cost on a calculator and writing a receipt.  During this time, ISMAEL WAZIRY was standing

in back of your affiant and the CW, facing the counter, while talking on a cell phone.  Your affiant

paid QUDRAT WAZIRY $228 in MPD funds for the handbags, as well as wallets, bearing

counterfeit reproductions of federally registered trademarks, specifically Louis Vuitton, Coach,

Prada, Gucci, Fendi and Christian Dior.  QUDRAT WAZIRY put the money in his pocket.  After

the transaction, QUDRAT WAZIRY wrote his name on a business card which he presented to your

affiant along with the receipt for the purchase.  All items purchased during this undercover visit were

later inspected by a private investigator from Blazer Investigations and found to bear counterfeit

marks, that is, spurious marks which are identical with, or substantially indistinguishable from,

marks that are registered for those goods on the principal register in the United States Patent and

Trademark Office and are in use, in violation of Title 18, United States Code, Section 2320.

### 3.    May 12, 2005, Undercover Purchase

15.    On May 12, 2005, your affiant and the CW entered WAZIR MARBLE AND

GENERAL MERCHANDISE, 1329 4th Street, NE, Washington, D.C., for the purpose of purchasing

counterfeit products again.  Your affiant and the CW were greeted by ISMAEL WAZIRY and were

approached by an individual who later identified himself as "Abdul," subsequently identified as

ABDUL JALIL WAZIRY.  In the presence of your affiant, the CW told ABDUL JALIL WAZIRY

that he and your affiant wanted to buy some purses, including Louis Vuitton, Channel, Prada, Fendi

and Coach.  ABDUL JALIL WAZIRY directed your affiant and the CW to a room located at the

back of the store.

16.    Once in the back, ABDUL JALIL WAZIRY displayed several purses bearing

counterfeit trademarks, including counterfeit Gucci, Coach, Prada and Louis Vuitton purses.

ABDUL JALIL WAZIRY told your affiant to select what your affiant wanted.  After some review

8

of the merchandise, your affiant asked where QUDRAT WAZIRY was, adding that your affiant had done business with him before and that he had given your affiant a good price on purchases. QUDRAT WAZIRY then approached your affiant and the CW and provided your affiant with what appeared to be a catalogue for Louis Vuitton products. QUDRAT WAZIRY told your affiant to pick out what products she wanted and it would take him about 10 to 15 minutes to return with her order. Your affiant selected eight items from the catalogue which QUDRAT WAZIRY copied down on a piece of paper. QUDRAT WAZIRY told your affiant that the purchase price for the eight items would be $200, said he would be back in 10 minutes, and exited from view.

17.    Your affiant notified surveillance units via her cell phone to be on the lookout for a male with dark hair, wearing a checked shirt, who may have exited the store from a rear door. At that time, Detective Doyle observed a man, later identified as QUDRAT WAZIRY, wearing a plaid shirt walking from the vicinity of the rear of WAZIR MARBLE AND GENERAL MERCHANDISE, up an alley, past a truck unloading merchandise into the rear of another business. QUDRAT WAZIRY, who was holding a piece of paper in his hands, proceeded to a metal garage type door located at the rear of Washington Perfume and Watch Company, 1345 4th St. NE, Washington DC. The grey steel door has the number "2" written in white on the door. The door was locked with a padlock located on the right side. Detective Doyle observed QUDRAT WAZIRY open the lock, raise the door, and enter what appeared to be a storage facility.

18.    Moments later, Detective Doyle and other members of the surveillance team observed QUDRAT WAZIRY exit the storage locker carrying a large black plastic bag containing items later identified to be eight counterfeit purses. Detective Doyle observed QUDRAT WAZIRY lower the metal door, lock the storage site and proceed back up the alley to the rear entrance of WAZIR

9

MARBLE AND GENERAL MERCHANDISE, 1329 4th Street, NE.

19. During QUDRAT WAZIRY's absence, your affiant and the CW engaged in a conversation with ISMAEL WAZIRY regarding business. Your affiant also noted that ISMAEL was frequently distracted by calls received on his cell phone. Approximately seven minutes after his departure, QUDRAT WAZIRY reappeared from the rear of the store carrying a black plastic bag containing eight counterfeit purses which he placed on the floor in front of your affiant. Upon his re-entry to the store, QUDRAT WAZIRY and ISMAEL WAZIRY engaged in a conversation in Farsi.

20. While your affiant inspected the counterfeit Louis Vuitton purses, QUDRAT WAZIRY told your affiant to be careful with them, in the sense that re-selling them would be risky. Your affiant responded that they would be sold at a purse party and not at the kiosk. Your affiant then asked QUDRAT WAZIRY about Louis Vuitton wallets. QUDRAT WAZIRY went up into what appeared to be an attic or second floor of the store and returned a few moments later with a counterfeit Louis Vuitton wallet which he presented to your affiant. QUDRAT WAZIRY told your affiant that he would provide her with a catalogue for her use in ordering in the future. Your affiant paid QUDRAT WAZIRY $202 in MPD pre-recorded funds which he again placed in his pocket. QUDRAT WAZIRY provided your affiant with a receipt for the purchase. All items purchased during this undercover visit were later inspected by a private investigator from Blazer Investigations and found to bear counterfeit marks, that is, spurious marks which are identical with, or substantially indistinguishable from, marks that are registered for those goods on the principal register in the United States Patent and Trademark Office and are in use, pursuant to Title 18, United States Code, Section 2320.

### 4.    November 2, 2005, Undercover Purchase

21.    On November 2, 2005, your affiant proceeded to WAZIR MARBLE AND GENERAL MERCHANDISE, 1329 4th Street, NE, Washington, D.C., for the purpose of verfiying that counterfeit goods were still being sold from the premises.  Your affiant met ISMAEL WAZIRY upon entering the store and told him your affiant wanted to purchase Louis Vuitton handbags.  ISMAEL WAZIRY instructed your affiant to wait and that someone would assist your affiant soon.  QUDRAT WAZIRY appeared and gave your affiant some papers showing different Louis Vuitton products.  QUDRAT WAZIRY asked your affiant to choose which of those products your affiant wanted to purchase.  Your affiant used an eyeliner pencil to place marks next to each of the products your affiant chose to buy and told QUDRAT WAZIRY that your affiant wanted to purchase twenty handbags.  QUDRAT WAZIRY asked your affiant to wait a moment while QUDRAT WAZIRY finished with another customer.   QUDRAT WAZIRY returned and went over your affiant's selections, stating which products WAZIR MARBLE AND GENERAL MERCHANDISE had and did not have.  QUDRAT WAZIRY then took the paper and told your affiant to wait ten minutes.  QUDRAT WAZIRY exited the store and entered a gold 2000 Lexus ES300, Virginia license plate number WAZIR1, Vehicle Identification Number JT6HF10U0Y0154091.  Surveillance teams followed QUDRAT WAZIRY as he drove to Budget Storage on New York Avenue, NE, exited his car and then returned a short time later.  QUDRAT WAZIRY was observed to place several blue bags containing pocketbooks into the Lexus and return to the store.  Your affiant observed QUDRAT WAZIRY enter the store holding the blue bags containing handbags.  QUDRAT WAZIRY handed one of the blue bags to your affiant, stating, "this one is yours."  Your affiant examined the contents of the bag and counted thirteen Louis Vuitton handbags.  QUDRAT WAZIRY left the store to

11

retrieve additional handbags for your affiant and was observed by the surveillance team going to the storage facility with the metal garage type door upon which the number "2" was written, located in the alley to the rear of Washington Perfume and Watch Company, 1345 4th Street, NE, Washington, DC., and parallel to 4th Street. QUDRAT WAZIRY returned with numerous Louis Vuitton handbags. Your affiant agreed to purchase some of those bags too for a total of twenty-six Louis Vuitton handbags and in exchange your affiant paid QUDRAT WAZIRY $560 in MPD funds. All items purchased during this undercover visit were later inspected by a private investigator from Blazer Investigations and found to bear counterfeit marks, that is, spurious marks which are identical with, or substantially indistinguishable from, marks that are registered for those goods on the principal register in the United States Patent and Trademark Office and are in use, in violation of Title 18, United States Code, Section 2320.

**E.    Evidence, Contraband, Fruits and Instrumentalities of Crime**

22.    Based upon your Affiant's training and experience, upon my participation in investigations of other illegal enterprises engaged in violations of narcotics laws, IRS laws, the Money Laundering Control Act, and related offenses, and upon the training and experience of other investigators participating in this investigation, including, but not limited to, that of Detective Edward Doyle, I know that:

a.    It is common for individuals involved in financial crime, including trafficking in counterfeit goods offenses, to maintain financial documents and records relating to both their personal and business financial affairs. These documents will show their acquisition, conversion, movement, secreting, transfer, and disbursement of currency, currency equivalents, and illegal goods, including counterfeit goods. It is also common for such persons to maintain currency, checks, money

orders, credit cards, credit card receipts, or other financial instruments which are the proceeds or facilitating property of the illegal activity. These documents, records, and financial instruments are often retained for long periods of time in secure and accessible locations, including residences, businesses, vehicles, safe deposit boxes, banks, and storage facilities;

b.      In the case of an illegal business enterprise like WAZIR MARBLE AND GENERAL MERCHANDISE, such financial documents and records often include inventory ledgers; purchase orders; confirmation letters; correspondence with co-conspirators; payment or disbursement ledgers; computer documents and/or files; invoices; employee lists and employment information; employee sales records; supplier and delivery records; receipts relating to illegal sales and to the expenditure of proceeds of illegal activities; U.S. Postal Service and/or next day carrier services documents and receipts; supplier, customer and/or co-conspirator telephone number and address listings; customer records; contracts; rolodex files; photographs and other forms of identification of associates and co-conspirators; appointment books; notes; airline ticket receipts; records of money orders; bank accounts; and financial instruments. All of the foregoing items and information constitute evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 371 and 2320.

c.      Individuals involved in financial crime, including trafficking in counterfeit goods, create such documents, records, and information by various means, including, but not limited to, computers, printers, telex machines, facsimile machines, currency counting machines, pagers (digital display beepers), and telephones, telephone answering machines, and cameras. These individuals also maintain such documents, records, and information in various forms, including, but not limited to, electrical, magnetic, photographic, and tangible form. The warrant application

therefore requests authorization to search for and seize all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as any information on an electronic or magnetic storage device, including hard drives, floppy diskettes, ZIP discs, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, pagers, personal digital assistants such as Palm Pilot computers, as well as printouts or readouts from any magnetic storage device); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

23.    Your affiant also knows that computer hardware and software, and digitally, electronically, and magnetically stored files and information may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware and software, and digitally, electronically, and magnetically stored files and information that are evidence of crime, contraband, instrumentalities of crime, or fruits of crime. In this case, the warrant application requests permission to search and seize all computer hardware and software, and digitally, electronically, and magnetically stored files and information on the premises of WAZIR MARBLE AND GENERAL MERCHANDISE that constitute or may be contraband, and that constitute or may be evidence, instrumentalities, or fruits of violations, by WAZIR MARBLE AND GENERAL MERCHANDISE and its owners or agents, of counterfeiting

14

offenses involving Title 18, United States Code, Sections 371 and 2320. Based on all of the foregoing facts, your affiant believes that, in this case, computer hardware and software, and digitally, electronically, and magnetically stored files and information on the premises of WAZIR MARBLE AND GENERAL MERCHANDISE constitute evidence, instrumentalities, or fruits of crime.

24.     Individuals involved in the sale of counterfeit products, such as CDs, DVDs, watches, handbags, luggage and other wearing apparel and commodities often sell their product from stores rented by them or from kiosks located in suburban shopping malls. Often times, they have the counterfeit goods shipped to their residence via commercial shippers and then remove the merchandise from the original shipping boxes and containers and transport it to their place of business where it is sold on the open market. Individuals involved in the sale of counterfeit products often hide and safeguard contraband by storing their inventory in residences and storage facilities located away from their primary business. Records pertaining to the rental and lease of storage facilities used to hide and disguise contraband; records concerning the ordering, purchase, shipment, storage, inventory, payment and sale of counterfeit goods and apparel; records and documents reflecting the identity of co-conspirators and associates; and computer hardware and software, and computer storage devices, used to generate and store such records are frequently located at such individuals' residences where they are considered safe from theft, damage or discovery. Furthermore, individuals involved in the sale of counterfeit products often update and enter business data into their computers during after-work hours in the privacy of their residence, and they often conduct business transactions, including sending and receiving faxes, sending and receiving email or other forms of communication regarding the purchase, transportation or sale of counterfeit

15

products from their residences after normal business hours due to the differences in world times

zones with overseas suppliers, contacts and criminal associates.

25.    Individuals involved in the sale of counterfeit products commonly engage in tax

evasion.  Frequently business owners will maintain two sets of books, one recording all cash sales

for their own information and one recording redacted cash sales figures.  These monthly ledger

sheets are often provided to bookkeepers and accountants who prepare quarterly sales tax payments

on behalf of the business.  Records detailing true sales figures are seldom kept at the business

location.  Rather, they are usually kept in office or computer areas in the business owners' residence.

26.    Individuals involved in the sale of counterfeit products commonly deal in large

amounts of cash, much of which must be held in order to structure bank deposits under $10,000.

Often this surplus cash is kept in the business owner's residence rather than in an office safe in an

unprotected store over night.  Individuals involved in financial crime also often use various money

laundering schemes to dispose of their criminal proceeds and to facilitate their crimes.  They

frequently co-mingle legitimate funds with illegitimate funds in an attempt to conceal and disguise

their sources of income and they sometimes use a "nominee" or "straw purchaser" to purchase assets.

27.    The aforementioned facts provide evidence of probable cause to believe that the

commercial retail distributor identified as WAZIR MARBLE AND GENERAL MERCHANDISE,

located at 1329 4th Street, NE., Washington, D.C., and its owners and agents, including but not

limited to QUDRAT WAZIR, ISMAEL WAZIR, and ABDUL JALIL WAZIR, have conspired to

traffic and have intentionally trafficked in goods while knowingly using a counterfeit mark on or in

connection with such goods, in violation of Title 18, United States Code, Sections 371 and 2320.

Additionally, there is probable cause to believe that evidence, instrumentalities, contraband, and

fruits of those violations, as described above and more particularly described in Attachment B, will

be found inside the premises of WAZIR MARBLE AND GENERAL MERCHANDISE, located at

1329 4th Street, NE., Washington, D.C., more particularly described in Attachment A.

28.    Based upon my knowledge, training, and experience, as well as information related

to me by agents and others involved in the forensic examination of computers, I know that computer

data can be stored on a variety of systems and storage devices.  I also know that during the search

of the premises it is rarely possible to complete on-site examination of computer equipment and

storage devices for a number of reasons, including the following:

a.    Searching computer systems is a highly technical process which requires

specific expertise and specialized equipment.  There are so many types of computer hardware and

software in use today that it is rarely possible to bring to the search site all of the necessary technical

manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also

be necessary to consult with computer personnel who have specific expertise in the type of computer,

software application or operating system that is being searched.

b.    The best practices for analysis of computer systems and storage media rely

on rigorous procedures designed to maintain the integrity of the evidence and to recover "hidden,"

mislabeled, deceptively-named, erased, compressed, encrypted, or password-protected data while

reducing the likelihood of inadvertent or intentional loss or modification of data.  A controlled

environment, such as a law enforcement laboratory, is typically required to conduct such an analysis

properly.

c.    The volume of data stored on many computer systems and storage devices will

typically be so large that it will be highly impractical to search for data during the execution of the

physical search of the premises. The hard drives commonly included in mere desktop computers are capable of storing millions of pages of text. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

29.    In light of these concerns, your affiant hereby requests the Court's permission to seize the computer hardware, and associated peripherals as discussed below, that are believed to contain some or all of the contraband, evidence, instrumentalities or fruits of crime described in the warrant and to conduct an off-site search of the hardware for such contraband, evidence, instrumentalities or fruits of crime if, upon arriving at the scene, the Agents executing the search conclude that it would be impractical to search the computer hardware on-site.

30.    Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in forensic examination of computers, I am aware that searches and seizures of evidence from computers taken from the premises commonly require agents to seize most or all of a computer system's input/output and peripheral devices, in order for a qualified computer expert accurately to retrieve the system's data in a laboratory or other controlled environment. Therefore, in those instances where computers are removed from the premises, in order fully to retrieve data from a computer system, investigators must seize all the storage devices, as well as the central processing units (CPUs), and applicable keyboards and monitors which are an integral part of the processing unit. If, after inspecting the input/output devices, system software,

and pertinent computer-related documentation, it becomes apparent that these items are no longer necessary to retrieve and preserve the data evidence, and are not otherwise seizeable, such materials and/or equipment will be returned within a reasonable time.

### F.    Analysis of Electronic Data

31.    The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques.  Such techniques may include, but shall not be limited to, surveying various file directories and the individual files that they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence authorized for seizure by the warrant); examining all the structured, unstructured, deleted, and overwritten data on a particular piece of media; opening or reading the first few pages of such files in order to determine their precise contents; scanning storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic key-word  searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

### G.    Conclusion

32.    Based on the information set forth above, the undersigned affiant submits that there is probable cause to believe that evidence, contraband, fruits, and instrumentalities relating to violations of Title 18, United States Code, Sections 371 and 2320 are located and will be found within the premises at 1329 4th Street, NE., Washington, D.C.

19

_____
Detective Lavinia A. Quigley
Washington, D.C., Metropolitan Police
  Department


Sworn to before me and subscribed in my presence this _____ day of November 2005.


_____
United States Magistrate Judge
District of Columbia

20

**ATTACHMENT A**
**Premises to be searched**

WAZIR MARBLE AND GENERAL MERCHANDISE, 1329 4th Street, NE., Washington, D.C., is described as a commercial retail establishment located in a red brick structure with a multi-colored sign above the entrance stating in large letters, "Marble Leather Onyx Gift Center." The word "Marble" is white. The word "Leather" is yellow. The word "Onyx" is white. The word "Gift" is red. And the word "Center" is white. Underneath those words appears, "Wazir Marble & General Merchandise Inc." To the left of "Wazir Marble & General Merchandise Inc." is the telephone number "(202) 547-1310" and to the right is the address 1329 4th St.N.E. Wash.D.C.20002."

## ATTACHMENT B
### Items to be seized

Items to be seized are the evidence, fruits, instrumentalities, or contraband relating to violations of Title 18, United States Code, Sections 371 and 2320, including but not limited to the following:

A.    <u>RECORDS</u>

1.    Records, documents, and materials containing information of past and present criminal activity involving trafficking or conspiring to traffic in goods while using a counterfeit mark on or in connection with such goods. The terms "records," "documents," and "materials" includes such items in all forms, including paper, photographic, mechanical, electronic, magnetic, and optical forms, or other coding forms on computer media or on media capable of being read by a computer or computer-related equipment, such as fixed hard discs, external hard discs, removable hard discs, floppy diskettes, compact discs (CDs), digital video discs (DVDs), tapes, optical storage devices, laser discs, electronic notebooks, zip disks, printer buffers, smart cards, or other memory storage devices.

2.    Records, documents, and materials that relate to the business of WAZIR MARBLE AND GENERAL MERCHANDISE, to trafficking in counterfeit goods, or to QUDRAT WAZIR, ISMAEL WAZIR, and ABDUL JALIL WAZIR, and that contain, constitute or concern inventory ledgers; purchase orders; confirmation letters; correspondence with co-conspirators; payment or disbursement ledgers; computer documents and/or files; invoices; employee lists and employment information; employee sales records; supplier and delivery records; receipts relating to illegal sales and to the expenditure of proceeds of illegal activities; U.S. Postal Service and/or next day carrier services documents and receipts; real estate and storage facility lease and title documents; supplier, customer and/or co-conspirator telephone or fax number and address listings; customer records; contracts; rolodex files; keys; photographs and other forms of identification of associates and co-conspirators; appointment books; notes; and airline ticket receipts.

3.    Records, documents, and materials containing, constituting or concerning financial transactions, financial statements, and financial summaries; including bank statements; financial instruments; financial applications; wire transfer records; credit cards; credit card statements and records; ATM access cards; credit reports; social security cards; accounting records; money orders; checks; tax records; ledgers; and journals.

4.    Records, documents, and materials that relate to the business of WAZIR MARBLE AND GENERAL MERCHANDISE, to trafficking in counterfeit goods, or to QUDRAT WAZIR, ISMAEL WAZIR, and ABDUL JALIL WAZIR, and that contain, constitute or concern identification, foreign or domestic travel, or occupancy, residency, and ownership, such as driver's licenses; passports; visas; airline tickets; social security documents; mail; utility records; telephone records; and mortgages, deeds, and lien records.

B.    <u>HARDWARE</u>

5.      Computer hardware, which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes any data-processing devices (such as central processing units, memory typewriters, Personal Data Assistants (PDAs), and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, removable magnetic disk storage drives and disks, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, and RAM or ROM units,); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

C.      SOFTWARE

6.      Computer software consisting of digital information which can be interpreted by a computer and any of its related components to direct the way they work; in whatever form it may be found, to include: electronic, magnetic, optical, or other digital form, in addition to printed source code. Software includes, but is not limited to: any programs to run operating systems, control peripheral equipment, applications, utilities, scripts, compilers, interpreters, and communications programs; any programs, whether functional or not, to assist in the defeat of security/protective feature in place to prevent the unauthorized copying, distribution, and/or activation of software; along with any and all programs necessary for the proper functioning of this software.

D.      PASSWORDS, DATA SECURITY DEVICES, AND COMPUTER DOCUMENTATION

7.      Computer passwords and other data security devices that are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital codes may include programming code that creates "test" keys or "hot" keys, which perform user-defined security-related functions when activated. Data security software or code which might also encrypt, compress, hide or "booby-trap" protected data to make it inaccessible or unreadable as well as reverse the process to restore the data. Computer passwords may be stored in electronic media or written down on ledgers, books, papers, etc.

8.      Computer-related documentation consisting of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use the computer hardware, software, or other related items.

E.      COUNTERFEIT GOODS AND RELATED EQUIPMENT, DEVICES AND MATERIALS

9.      All apparel or other items, including but not limited to purses, handbags, wallets,

2

belts, scarfs, glasses, or hats that bear, or that appear to be possessed with the intent to affix, counterfeit marks; any unaffixed marks such as labels, logos, or identifying containers, documentation or packaging; and any tools, equipment, devices or materials for use in the manufacture, preparation, creation, or distribution of counterfeit goods or counterfeit marks.

3